IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL ACTION NO. 18-417 |
| | : | |
| RODNEY KENT | : | |
| | : | |
| | : | |
| | : | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW ON
MOTION TO SUPPRESS ALL STATEMENTS GIVEN BY DEFENDANT

RUFE, J.                                                          MARCH 3, 2021

Defendant Rodney Kent is charged with sex trafficking of a minor via force, threats and

coercion under 18 U.S.C. § 1591(A)(1), (b)(1), & (b)(2). Kent alleges that his constitutional

rights were violated by FBI agents for failing to properly instruct him of his rights before he

made incriminating statements to the government.[1] Kent has filed a Motion to Suppress two sets

of statements. He first moves to suppress statements made during the booking process.[2] Second,

he moves to suppress statements made after receiving and waiving his *Miranda* rights.[3] Upon

consideration of Defendant's Motions to Suppress, the Government's response thereto, and the

evidence, testimony, and oral argument presented at the evidentiary hearing, the Court now

enters its findings of fact and conclusions of law.

I.        FINDINGS OF FACT

1.        On September 28, 2018, Federal Bureau of Investigation Agents Christopher

Jackson, Meghan Moody, and Special Agent Jason Knight took custody of Kent at the Criminal

---

[1] Def's Mot. to Supp. [Doc. No. 86] at 1.

[2] *Id.* at 3

[3] *Id.*

Justice Center ("CJC") at 1301 Filbert Street in Philadelphia and transported him to the FBI facility at 600 Arch Street for processing.[4]

2.      The case agent, FBI Special Agent Glenn Booth, was not available at the time of arrest. Booth asked Agent Jackson and Agent Moody to take custody of Kent at the CJC. These Agents had limited knowledge of Kent's case file except that it was a trafficking case that involved a minor.[5]

3.      Before leaving the CJC, Kent asked Jackson about his charges.[6] Jackson stated that they had a federal arrest warrant and he would review the charges and arrest warrant with Kent when they arrived at the FBI facility.[7]

4      During the short car ride from the CJC to the FBI facility Jackson did not speak with Kent about his charges or why he had been arrested.[8] However, during this ride, Jackson spoke with case agent Booth by telephone.[9] Jackson notified Booth that they had Kent in custody and that they were heading to the FBI office.[10] Booth directed Jackson to try and interview Kent, but Jackson advised Booth that they were pressed for time and conducting an interview was very unlikely.[11] At no point during this conversation did Booth direct Jackson to elicit certain information from Kent or discuss the facts of the case in more detail.[12]

---

[4] FBI Special Agent Jason Knight was present when the officers took custody of Kent but did not participate in the processing or questioning of Kent. N.T. 9/8/20 at 37.

[5] N.T. 9/8/20 at 32.

[6] *Id.* at 49.

[7] *Id.*

[8] *Id.* at 53.

[9] *Id.* at 38.

[10] *Id.*

[11] *Id.* at 38-39. Agent Jackson testified that because they wanted to get Kent in front of a magistrate judge that afternoon, the processes of bringing him in and getting his information processed was all rushed. *Id.* at 33.

[12] *Id.* at 63, 79-80, 87, 95, 99-101.

5.        On arrival at the FBI facility, Jackson and Moody began processing Kent for an initial appearance before a federal magistrate judge that afternoon. As part of the process, Jackson and Moody had to complete the mandatory U.S. Marshal Intake Form. This form includes personal information from a suspect such as a telephone number and date of birth.[13]

6.        Jackson filled out the intake form in his own handwriting with information received from Kent. This information included Kent's phone number and his birthdate. The phone number Kent provided the government was the same phone number that is allegedly linked to the Backpage.com account at issue in this case.[14] Additionally, the email address linked to this Backpage.com account included the four-digit month and day of Kent's birthday (1129).[15]

7.        At the start of the processing interview, Jackson and Moody reviewed with Kent the charges in the indictment. When Kent asked follow-up questions, Jackson informed him that he must advise him of his rights before they discussed anything further.[16]

8.        Jackson presented the *Miranda* waiver form to Kent. Jackson first read the form "verbatim" to Kent.[17] Jackson then presented the form to Kent and advised him to read the form for himself and, if he understood the form and wanted to talk, to initial each bullet and sign the waiver.

9.        After reading the waiver form, Kent placed his initials next to each line and signed his name at the bottom.[18]

---

[13] This process also included taking photographic "mug shots," DNA swabs, and fingerprints from the Defendant. *Id.* at 34.

[14] Gov. Trial Mem. [Doc. No. 84] at 3.

[15] *Id.*

[16] N.T. 9/8/20 at 40.

[17] *Id.*

[18] Gov. Ex. 2 at 10.

10.     Following his waiver, Jackson and Moody conducted a short interview asking Kent questions, including the standard questions agents ask in trafficking cases such as whether Kent had knowledge of Backpage.com because that is the main website used to post advertising for prostitution, whether Kent had any girls prostituting for him, and whether the defendant knew anyone involved with human trafficking.[19] Jackson summarized the findings from this interview in an FBI 302.[20]

11.     During this interview, Kent stated that he did not have any girls working for him as prostitutes.[21] He stated that he did have a friend who is an exotic dancer but not a prostitute.[22] He also stated that he has a sister who was also arrested for human trafficking.[23]

12.     Kent admitted that he had knowledge of Backpage.com, and was aware that the website was utilized to advertise for the purpose of prostitution. He stated that he would log on to the website just to view women.[24] After answering these questions, Kent asked to have an attorney present before answering any additional questions.[25] The interview concluded at that point.

13.     Once the interview concluded, Jackson and Moody transferred custody of Kent to the United States Marshals. Kent appeared before a magistrate judge in federal court in Philadelphia that afternoon.[26]

---

[19] N.T. 9/8/20 at 80, 88-92.

[20] Gov. Ex. 2 at 11.

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*; N.T. 9/8/20 at 45, 80, 90.

[26] *See* Doc. No. 4.

14.     The Agents explained that because they did not plan to interview him before he appeared in court, they did not record the short interview that did occur as required by DOJ policy.[27]

15.     Kent testified to a substantially different chain of events on this day, asserting that prior to being read his *Miranda* rights and initialing the *Miranda* waiver form, Jackson and Moody interrogated him about Backpage.com as well as other substantive issues related to his case.[28] Kent further testified that he did not understand the *Miranda* rights or the waiver form and that his waiver was not made with full awareness of the consequences of his decision. Kent also testified that he had been arrested before and has heard the *Miranda* warnings on multiple other occasions.[29]

16.     Finally, Kent repeatedly testified that after going through the booking process, but prior to appearing before the federal magistrate judge, he met with a "pretrial service lady" who allegedly "left [Kent] under the impression that what she was saying is that [the interview with pretrial services] should have been done first." He also testified that she told him he was supposed to have met with her prior to going through the booking process and apologized to him for the booking process being "rushed" and "backwards."[30] Kent's claims were not corroborated by any other testimony or documentation.

17.     The Court finds credible, and credits, the testimony of the federal agents and does not find Kent's testimony credible.

---

[27] Press Release, U.S. Dep't of Justice, Attorney General Holder Announces Significant Policy Shift Concerning Electronic Recording of Statements (May 22, 2014), http://www.justice.gov/opa/pr/attorney-general-holder-announces-significant-policy-shift-concerning-electronic-recording.

[28] N.T. 9/8/20 at 108–109.

[29] *Id.* at 120–21. Kent himself testified that "[i]f I was arrested ten times, I'd say I probably may have heard [the *Miranda* rights] twice."

[30] *Id.* at 112, 116, 128–130, 132.

18.     Based upon the testimony of the federal agents Booth, Jackson, and Moody, the Court concludes that the FBI agents who were involved in processing did not have a reasonable belief that asking Kent for his contact number and date of birth in order to complete a mandatory intake form would elicit an incriminating response.[31]

19.     The Court also finds that any substantive question answered by Kent occurred after the FBI agents read Kent his *Miranda* rights and after Kent initialed the *Miranda* waiver form and signed his name at the bottom.

## II.   DISCUSSION

The government seeks to introduce both portions of Kent's answers to routine booking questions and portions of Defendant's post-*Miranda* statement.[32] Kent moves to suppress all statements he made to the government, including his phone number, date of birth, and his knowledge of Backpage.com.[33] He argues the statements were elicited by the FBI in an unconstitutional manner because the statements were either given prior to being read his *Miranda* rights or, in the alternative, that he did not understand or voluntarily waive his rights.[34]

Statements stemming from the interrogation of a defendant without procedural safeguards, such as *Miranda* warnings, must be suppressed.[35] Law-enforcement officers must

---

[31] Booth testified that "[he] did not" give Jackson or Moody any relevant information, specific questions to ask Kent, or directions to solicit a specific phone number from Kent, N.T. 9/8/20 at 95. Although Kent claims that Jackson asked about his phone number in a way to "catch him off guard," the record does not support the motive attributed by Kent. *Id.* at 124-125.

[32] Gov. Trial Memo. [Doc. No. 84] at 2.

[33] Def's Mot. to Supp. [Doc. No. 86] at 3. Kent moves to suppress statements admitting that "(1) he was aware of Backpage.com; (2) he was aware that Backpage.com was used to advertise prostitution; and (3) he would log on to Backpage.com to view females."

[34] Def's Proposed Findings of Fact and Conclusions of Law [Doc. No. 110] at 10.

[35] *Rhode Island v. Innis*, 446 U.S. 291, 297 (1980) (citing *Miranda v. Ariz.*, 384 U.S. 436, 479 (1966)).

warn a suspect before questioning that he has the right to remain silent, and a right to the presence of an attorney for a custodial interrogation.[36]

A suspect may waive his *Miranda* rights.[37] "To establish a valid waiver, the [prosecution] must show that the waiver was knowing, intelligent, and voluntary . . . ."[38] In determining whether a waiver was voluntary, knowing, and intelligent, courts engage in a two-prong inquiry: (1) the statement must be "the product of free and deliberate choice rather than the result of intimidation, coercion, or deception;" and (2) the waiver must be "made with full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."[39] "[T]he government has the burden of proving the waiver by a preponderance of the evidence."[40]

### A. The Government is Permitted to Introduce Defendant's Answers to the Pre-*Miranda* Booking Questions

In *Pennsylvania v. Muniz*, the Supreme Court held that booking questions regarding "name, address, height, weight, eye color, date of birth, and current age do not qualify as custodial interrogation" unless the questions are "designed to elicit incriminatory admissions."[41] The court explained that these routine questions are an exception to *Miranda* requirements because they are necessary to secure biographical data for booking.

The pre-*Miranda* questions asked by Agent Jackson and Moody therefore did not constitute an interrogation because they were routine biographical questions and the agents did

---

[36] *Maryland v. Shatzer*, 130 S. Ct. 1213, 1219 (2010) (citing *Miranda*, 348 U.S. at 444).

[37] *Id.* (Citing *Miranda*, 348 U.S. at 475).

[38] *Id.* (Citing *Miranda*, 348 U.S. at 475).

[39] *United States v. Sriyuth*, 98 F.3d 739, 748-49 (3rd Cir. 1996).

[40] *United States v. Velasquez*, 885 F.2d 1076, 1086 (3d Cir. 1989) (citing *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986)).

[41] 496 U.S. 582, 601 & n.14 (1990); *See also Innis*, 446 U.S. at 301 ("Interrogation" refers to "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.").

not know the questions would elicit an incriminating response. Although a telephone number is not specifically mentioned is *Muniz*, there is "no reason to treat a request for a telephone number at booking any differently than the elicitation of the routine types of identifying information that courts have long found to lie within the *Muniz* exception to *Miranda*."[42] A "person's telephone number is as much a part of his identity as is his name, address, and date of birth."[43]

Furthermore, the evidence shows that Jackson did not coerce, intimidate, or specifically ask Kent for a specific phone number. Rather, when asked to supply a contact number to complete the intake form, Kent chose to provide Jackson with his cell phone number. That this number apparently matched the Backpage.com account does not render the question an interrogation.[44] Although the FBI agents were familiar with sex trafficking cases in general and Backpage.com, neither had reason to know that Kent would provide the same phone number that he allegedly used on the website.[45]

Kent contends that Jackson and Moody obviously conferred with Booth and therefore knew that asking for his phone number would elicit an incriminating response. However, Kent's assertion lacks evidentiary support. All three FBI agents who testified at the pretrial hearing stated there was no communication of this type.[46] The Court finds the agents' testimony credible.

The Court concludes, based on the evidence, that the FBI agents had no reason to believe that the routine booking questions would elicit incriminating information from Kent. The

---

[42] *United States v. Veloz*, No. 12-10264, 2016 WL 6405808, at *1 (D. Mass. Oct. 27, 2016).

[43] *Id.*

[44] N.T. 9/8/20 at 36.

[45] *Id.*

[46] N.T. 9/8/20 at 36, 39, 62, 66, 75, 79-80, 83, 87, 95, 99-101.

information obtained—Kent's cell phone number and a date of birth—is the type of information that falls squarely within the *Muniz* exception and is admissible.

### B. The Government is Permitted to Introduce Kent's Post-*Miranda* Statement

Jackson testified that he "read the *Miranda* form verbatim and then turned it over to Kent for him to read, and [told him] if he understood everything and would like to speak to the agents, he should initial each bullet and sign it,"[47] and this testimony was corroborated by Agent Moody.[48] Both agents also testified that after hearing the rights read aloud and after reading the rights on his own, Kent initialed and signed his name under the heading of "**YOUR RIGHTS**."[49] This occurred after completion of the intake form and before the agents asked him substantive questions.[50]

In contrast, Kent testified that upon arrival at the FBI facility, Agent Jackson and Moody placed him in an interviewing room and began asking him questions about his knowledge of Backpage.com before he was read the *Miranda* waiver form.[51] Kent testified that Jackson was pushing him to reveal information about his involvement with Backpage.com, and claimed that Jackson told Kent "you know we know more than you're telling us."[52] Further, Kent testified that only after he disclosed his knowledge of Backpage.com did he realize these questions were about his conduct, and not about his sister.[53] At this point, Kent alleges he asked for an

---

[47] N.T. 9/8/20 at 40.

[48] N.T. 9/8/20 at 77.

[49] Gov. Ex. 2 at 10.

[50] N.T. 9/8/20 at 34, 38-41, 45, 49, 53, 56-58, 62-64, 66, 70, 77, 84-86.

[51] *Id.* at 108-109.

[52] *Id.*

[53] Kent testified that his sister had recently been arrested and charged with sex trafficking of a minor and was being held at Riverside Correctional Facility. *Id.* at 110.

attorney.[54] Kent claims that only after this request did Jackson and Moody present him with the

*Miranda* waiver form and instructed him to just sign it without explaining what it meant.[55] After

hearing all of the testimony at the hearing, the Court credits the corroborated testimony of the

agents over Kent's recollection of events.

Viewing the totality of the circumstances, the Court finds that the agents did not engage

in coercion, intimidation, or deception. The Court specifically credits the testimony that the

agents read the *Miranda* warnings to Kent and that he was able to review the form. Kent then

made a free and deliberate choice to waive his rights. The Court does not credit Kent's

unsupported testimony that he did not understand these rights or that his waiver was not made

with full awareness of the consequences of his decision. The Court notes that Kent has been

arrested before and has heard the *Miranda* warnings.[56] He was not unfamiliar with this process

and was able to make a voluntary, intelligent, and knowing waiver of his *Miranda* rights.

Therefore, based on the totality of circumstances surrounding this event, the Court concludes that

Kent "voluntarily agreed to speak with the officers, was advised of his *Miranda* rights, and

signed a form waiving constitutional rights." Kent's statements therefore are admissible.[57]

Kent also argues that his statements should be suppressed because the interview was not

recorded in violation of United States Department of Justice guidance effective July 22, 2014,

which established a presumption in favor of electronically recording all statements made by

---

[54] *Id.* at 110-111

[55] *Id.* Kent also testified that he believed Agent Jackson and Agent Moody gave false testimony in terms of the chronology of events. *Id.* at 118.

[56] *Id.* at 121. Kent himself testified that "[i]f I was arrested ten times, I'd say I probably may have heard [the *Miranda* rights] twice."

[57] *United States v. Green*, 516 F. App'x 113, 127 (3d Cir. 2013).

individuals in federal custody after arrest before an initial court appearance.[58] However, the

guidelines provide a best practice, and explicitly do not "create any rights or benefits, substantive

or procedural, enforceable at law or equity . . . against the United States."[59] As the Court of

Appeals has held, "Department of Justice guidelines and policies do not create enforceable rights

for criminal defendants."[60] Although failing to record a custodial interview may be a bad

practice, it does not render the interview unconstitutional.[61]

      The Court finds Kent voluntarily waived his Miranda rights prior to answering questions

about his knowledge of Backpage.com. This waiver was not the product of any coercion,

intimidation, or deception. Kent made an independent decision to waive his *Miranda* rights and

speak with the government. For these reasons, the government will be permitted to introduce

Kent's post-*Miranda* statement in which he admits that: "(1) he was aware of Backpage.com; (2)

he was aware that Backpage.com was used to advertise prostitution; and (3) he would log on to

Backpage.com to view females."[62]

---

[58] Press Release, U.S. Dep't of Justice, Attorney General Holder Announces Significant Policy Shift Concerning Electronic Recording of Statements (May 22, 2014), http://www.justice.gov/opa/pr/attorney-general-holder-announces-significant-policy-shift-concerning-electronic-recording.

[59] Memorandum, U.S. Dep't of Justice, Policy Concerning Electronic Recording of Statements, at 2-3 (May 12, 2014).

[60] *United States v. Wilson*, 413 F.3d 382, 389 (3d Cir. 2005) (citing *United States v. Gomez*, 237 F.3d 238, 241 n.1 (3d Cir. 2000)); *see also United States v. Wright*, 937 F.3d 8 (1st Cir. 2019) (Wright does attempt to ground his claim in a United States Department of Justice policy that requires the recording of custodial interviews conducted in a place of detention with suitable recording equipment. But, that policy does not purport to create legal rights that may be enforced by criminal defendants") (citing *United States v. Craveiro*, 907 F.2d 260, 264 (1st Cir. 1990).

[61] *See*, *e.g.*, *United States v. Tykarsky*, 446 F.3d 458, 477 (3d Cir. 2006) ("Whatever the merits of the policy arguments in favor of requiring the recording of interrogations may be, it is clear that such recording is not mandated by the United States Constitution. We therefore reject this argument."), *overruled on other grounds*, 570 U.S. 99 (2013).

[62] Def's Mot. to Supp. [Doc. No. 86] at 3.

**III.**    **CONCLUSIONS OF LAW**

1.       The FBI agents did not violate Kent's constitutional rights by asking him routine booking questions because the questions related to biographical information and the FBI agents had no reason to believe that the routine booking questions would elicit an incriminating response.

2.       Kent's statements made after he received, and waived, his *Miranda* rights should not be suppressed because Kent voluntarily, intelligently, and knowingly waived his rights prior to the government conducting a custodial interrogation.

**IV.**    **CONCLUSION**

For the foregoing reasons, Defendant's Motion to Suppress will be denied. An appropriate Order follows.